UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                                   :
COURTNEY JOHNSON,                                  :        Index No.
                                                   :
                        Plaintiff,                 :        **COMPLAINT**
                                                   :
            -against-                              :
                                                   :        **PLAINTIFF DEMANDS**
BNP  PARIBAS,                                      :        **TRIAL BY JURY**
                                                   :
                        Defendant.                 :
----------------------------------------------------------------X

Plaintiff Courtney Johnson ("Plaintiff" or "Ms. Johnson"), by her attorneys, Liddle

& Robinson, L.L.P., hereby submits this Complaint against Defendant BNP Paribas ("BNP" or

"Defendant") respectfully alleging as follows:

## THE NATURE OF THE ACTION

1.      This is a civil action for damages and remedies brought under (a) Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (b) Section

1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and (c) the Administrative

Code of the City of New York, § 8-101 et seq. ("New York City Human Rights Law").

2.      Plaintiff, an African-American female, was discriminated against, retaliated

against, and subjected to a hostile work environment by Defendant on the basis of her race, sex,

and gender as most recently demonstrated by Defendant's termination of Plaintiff's employment

despite Plaintiff being one of the highest, if not the highest, producers in her group.

3.      Plaintiff alleges that Defendant subjected her to discrimination and

retaliation by, among other things: (1) taking away some of her accounts and redistributing most

of those accounts to less qualified white and/or male employees; (2) promising coverage of her accounts to white and/or male potential new hires; (3) preventing her from attending client meetings; (4) purposefully withholding information from her regarding client developments; (5) giving her low performance reviews; (6) awarding her no bonus for 2011 despite the fact that she was the highest producer in her group that year; (7) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even though she was the highest producer in her group that year; (8) constantly critiquing her performance and interactions with her clients, while not applying the same level of scrutiny to her peers; (9) reprimanding and humiliating her in front of her peers; and (10) terminating her employment after she complained of BNP's discriminatory conduct.

## THE PARTIES

4.      Plaintiff Courtney Johnson is an African-American female who was employed by BNP for over five years.  Ms. Johnson is a resident and domiciliary of the state of New York.

5.      Defendant BNP Paribas is a financial services company that offers its clients a range of services from investment and retail banking to asset management services.  BNP's American headquarters is located at 787 7th Avenue, New York, New York 10019.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1367.

7.      On or about September 29, 2015, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission (the "EEOC") dated September 24, 2015, and she is filing this Complaint within ninety days of receiving the Notice of Right to Sue.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant resides in the Southern District of New York, and a substantial part of the events giving rise to Plaintiff's claims occurred within the Southern District of New York; and under 28 U.S.C. § 1391(c) because Defendant is subject to personal jurisdiction in the Southern District of New York.

## FACTS

### Ms. Johnson's Background

9.      Ms. Johnson graduated from Wellesley College with a double major in art history and political science.  Subsequently, she was employed by Salomon Brothers and Citigroup in the Fixed Income and Emerging Market Sales department for over ten years.  Ms. Johnson held the position of Director at the time she left Citigroup.

### Ms. Johnson's Employment At BNP

10.      Ms. Johnson was hired by Garry Popofsky, Managing Director and Head of the Foreign Exchange and Emerging Market Sales group at BNP, in October 2009.  As a Director in the Emerging Market Sales group, Ms. Johnson reported directly to Mr. Popofsky.

11.      Ms. Johnson was the only African-American female in the Emerging Markets Sales group.

12.    In Summer 2010, Mr. Nunn, a white male, replaced Mr. Popofsky as the new Managing Director and Head of the Foreign Exchange and Emerging Market Sales group. As a result, Ms. Johnson began reporting to Mr. Nunn.

13.    In Spring 2011, BNP hired Ms. Roche, a white female, as a Managing Director and the Head of the Emerging Markets Sales group. At that time, Ms. Johnson began reporting directly to Ms. Roche, with Ms. Roche reporting to Mr. Nunn.

14.    Throughout Ms. Johnson's employment with BNP, she was qualified for her position and performed her duties and responsibilities in a professional and competent manner. In fact, Ms. Johnson was the highest producer in the Emerging Markets Sales group throughout most of her employment with BNP.

**BNP Discriminates Against Ms. Johnson**

15.    At the commencement of Ms. Johnson's employment with BNP in October 2009, her base salary was $175,000. She received a 2009 bonus of $126,461 as a cash performance bonus plus €60,397[1] as a deferred compensation award as guaranteed by her employment agreement. During Ms. Johnson's conversations with Mr. Popofsky at that time, he assured her that this number would serve as a guideline for her 2010 full-year bonus.

16.    Ms. Johnson received an annual base salary of $200,000 as of February 1, 2010. In April 2010, Ms. Johnson received a standard pay raise for her position to match industry norms. Accordingly, her base salary increased to $300,000. In 2011, Ms. Johnson's base salary increased to $310,000, where it remained until the termination of her employment.

---

[1] Ms. Johnson's deferred bonus for 2009 was granted in Euros.

17.     Even though Ms. Johnson was the highest producer in the Emerging Markets Sales group in 2010, BNP awarded her a lower bonus than the one she was given in 2009 of $172,030.  Mr. Nunn informed her that this low number was based upon the bonus she had received in 2009.  Ms. Johnson explained that her 2009 bonus number was pro-rated to reflect that she had only been employed at BNP for two months, but Mr. Nunn ignored this explanation.  Upon information and belief, non-African Americans and/or male individuals similarly situated within BNP received a higher bonus.

18.     In 2011, Ms. Johnson remained the highest producer in the Emerging Markets Sales group, generating in sales credits approximately €5,250,000.  Upon information and belief, by comparison, the next highest producer in her group generated only approximately €2,000,000 in sales credits.  Despite her outstanding performance and production number for 2011, in January 2012 Ms. Johnson received the low performance rating of 3 for 2011 which indicates that improvement was needed (1 = exceeds expectations; 2 = consistently met expectations; 3 = performance needs to be improved; 4 = unsatisfactory performance level).

19.     Ms. Johnson expressed her concern to BNP that her performance review was not indicative of her performance for 2011.  For example, one of the critiques Ms. Johnson received was that she needed to improve with respect to establishing relationships of trust with her clients.  This criticism is baseless.  When Ms. Johnson asked Mr. Nunn and Ms. Roche how they and BNP had made this determination, they informed her that BNP had not investigated this claim and, in fact, they had not received any feedback from any of Ms. Johnson's clients.

20.     Ms. Johnson was also wrongly accused in her review of taking sales credits from a junior male member of her group for herself. In actuality, Ms. Roche had approved the sales credit sharing agreement between Ms. Johnson and this other employee. This was not the first time Ms. Roche and Mr. Nunn wrongfully accused Ms. Johnson of inappropriate behavior. Upon information and belief, BNP did not treat non-African Americans and/or male individuals in this manner.

21.     When Ms. Johnson expressed her disagreement with her performance review to BNP, Ms. Roche indicated that she agreed with some of the concerns Ms. Johnson raised. Accordingly, Ms. Roche provided Ms. Johnson with a revised performance review. However, this "revised" performance review also rated Ms. Johnson a 3. Consequently, Ms. Johnson again expressed to BNP her concern that her review failed to depict the good performance and high production number she had been responsible for in 2011.

22.     Mr. Nunn and Ms. Roche informed Ms. Johnson that they would review her 2011 performance again and provide her with a second revised performance review. Nevertheless, BNP did not provide Ms. Johnson with a second revised version of her 2011 performance review.

23.     On March 2, 2012, Mr. Nunn and Ms. Roche informed Ms. Johnson that she would not be receiving a bonus for her 2011 performance due to her poor performance review. As stated above, however, Ms. Johnson never received a final version of her 2011 performance review. Upon information and belief, other non-African Americans and/or male individuals similarly situated within BNP received a bonus, despite having lower production numbers than Ms. Johnson.

24.     Ms. Johnson continually experienced discriminatory treatment throughout her employment at BNP because she is an African-American female.

25.     For example, BNP took away a number of Ms. Johnson's accounts and gave at least six of them to two of her less experienced male colleagues.  While BNP does have a practice of redistributing accounts based on the clients' needs and requests, in these instances the clients did not request a change.  In fact, several clients requested to continue working with Ms. Johnson. Nevertheless, BNP redistributed her accounts to less qualified men.

26.     Upon information and belief, some of these accounts were promised to new male hires without Ms. Johnson's knowledge or consent.

27.     Furthermore, Mr. Nunn and Ms. Roche unjustifiably reprimanded and embarrassed Ms. Johnson in front of her peers.  Upon information and belief, Mr. Nunn and Ms. Roche did not treat non-African Americans and/or male individuals in a similar manner.

28.     Mr. Nunn and Ms. Roche constantly expressed their concern to Ms. Johnson regarding how she interacted and did business with clients, despite the fact that Ms. Johnson was one of, if not the most, experienced Emerging Markets Sales person in her group and consistently had the highest performance numbers in her group.  Upon information and belief, the accounts of non-African Americans and/or male individuals were not scrutinized so critically.

29.     On several occasions, business information was withheld from Ms. Johnson by Ms. Roche and Mr. Nunn.  Upon information and belief, this was done in an effort to isolate Ms. Johnson from her group and force her out of BNP.

30.    Ms. Roche also made racist and offensive statements in the workplace.  On one occasion after overhearing two Asian colleagues with accents speaking to each other, she leaned over and whispered to a colleague that she was happy that her daughter—an adopted Asian child—would not grow up to speak with an accent.

31.    During the process of interviewing nannies for herself at BNP offices, Ms. Roche commented to a colleague that while her current black nanny was effective at caring for her child at a young age, she now needed an Asian nanny to effectively discipline and educate her child.

**Ms. Johnson Complains About Discriminatory Conduct Towards Her**

32.    Ms. Johnson filed a Charge of Discrimination with the EEOC on March 12, 2012 due to the discriminatory conduct she was subjected to by BNP.

33.    Following the filing of Ms. Johnson's Charge of Discrimination, BNP continued to discriminate and to retaliate against Ms. Johnson.  BNP proceeded to transition Ms. Johnson's accounts to other employees, even though a transfer was not requested by the clients, and to speak negatively about Ms. Johnson, all of which impacted and jeopardized her career trajectory.  In fact, Ms. Johnson was told by an employee at a competing firm, as well as colleagues at BNP, that they heard that BNP was trying to "get rid of" her.

34.    Furthermore, Mr. Nunn and Ms. Roche repeatedly pressured Ms. Johnson to book an erroneous loss to BNP while her white colleagues were permitted to adhere to different internal procedures.  Upon information and belief, this was an attempt by BNP to falsely portray Ms. Johnson as a poor performer and insubordinate for not agreeing to book an erroneous loss at management's direction.

35.     Ms. Johnson remained the highest producer in the Emerging Markets Sales group for 2012.  Nevertheless, she was unfairly criticitzed in her performance review for that year.  Ms. Johnson received low assessment scores in certain areas which are inaccurate and unsubstantiated.  For example, BNP's criticisms regarding her contributions as a team player are false, and BNP was unable to provide relevant examples in support of this determination.

36.     After receiving her review, Ms. Johnson complained to BNP that she was being subjected to discrimination and retaliation.  In fact, BNP's discriminatory and retaliatory behavior was so pervasive that Ms. Johnson's colleagues spoke to her, other employees, and management about this treatment.

37.     On February 26, 2013, in yet another instance of discrimination and retaliation, Ms. Roche reprimanded Ms. Johnson without justification in multiple emails for being absent from the office in order to attend a client-sponsored conference and surrounding meetings with said client.  Notably, Ms. Johnson's absence was business-related and she alerted team members and Ms. Roche that she would not be in the office that day through various forms of communication.  Upon information and belief, her white and male peers were not chastised for their absences of any kind, including those directly related to promoting BNP's business.  As a result of Ms. Roche's correspondence, Ms. Johnson requested a meeting to discuss BNP's treatment of her.

38.     The following day, on February 27, 2013, Ms. Johnson met with Ms. Roche.  During this meeting Ms. Johnson requested that Ms. Roche stop sending her harassing emails and she complained of Ms. Roche's repeated undermining.

39.     Disregarding Ms. Johnson's complaints, BNP sent Ms. Johnson a written warning later that day that she "must show immediate and sustained improvement" with respect to her conduct.  Subsequently, Ms. Johnson was called to a meeting with Human Resources representative, Carlos Beltre, and Ms. Roche and repeatedly directed to sign the written warning. Ms. Johnson explained that she disagreed with the warning and refused.

40.     Upon information and belief, Ms. Johnson was the top producer in her group for 2013.   Despite her exemplary performance, she was unfairly criticized in her performance review for that year.   BNP's criticisms of Ms. Johnson, including its suggestion that she is "view[ed] and perceived globally" in a negative way, were baseless and a pretext for its discrimination and retaliation.

41.     In Fall 2014, Ms. Johnson had a meeting with Mr. Beltre and Adrian Boehler, the Global Head of FXLM Sales, about BNP's discriminatory and retaliatory treatment. Prior to this meeting, Mr. Boehler and Ms. Johnson had several discussions during which she complained about her treatment by BNP, specifically Mr. Nunn and Ms. Roche, and even suggested a possible transfer to a different team to escape their unlawful conduct.   During this conversation, Ms. Johnson once again asked for BNP's discriminatory and retaliatory behavior to stop.  Messrs. Beltre and Boehler listened to Ms. Johnson's complaints, and later instructed her to revise her 2014 mid-year performance review.

42.     Following this meeting and Ms. Johnson's revision of her 2014 mid-year performance review, no action was taken by BNP to address her concerns.

43.     On December 1, 2014, Ms. Johnson was informed by BNP that her employment was being terminated due to a restructuring in the Emerging Markets Sales group. Ms. Johnson was the only member of the group that was laid off in this alleged restructuring. Upon information and belief, this "restructuring" of one person was a convenient way for BNP to hide its discrimination and retaliation, especially considering that BNP hired Kris Walsh, a less experienced white male, as Ms. Johnson's replacement months before her employment was terminated. Further, Ms. Johnson has more experience than all of the other employees in the Emerging Markets Sales group who were not laid off as a result of this alleged restructuring.

44.     Upon information and belief, Ms. Johnson was on track to be the second highest producer in her group for 2014.

45.     In addition to the discrimination that Ms. Johnson was subjected to, there exists a broader pattern and practice of discrimination at BNP. Upon information and belief, several minority and/or female employees have experienced BNP's harassing and hostile environment and some, including for example Lauren Bresnahan, have left the Emerging Markets Sales group (and BNP altogether) as a result.

46.     BNP has also failed to adequately address and rectify complaints from its employees of harassment by Andrew Schlesinger, the U.S. Head of Emerging Markets Credit Sales and a white male. Further, former employee Jean-Marc Orlando has alleged in federal court that BNP discriminated against him due to his religious beliefs and retaliated against him for his complaints of discrimination.

### FIRST CAUSE OF ACTION
#### (Race Discrimination under Title VII – Against BNP)

47.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

48.     On September 24, 2015, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on September 29, 2015.

49.     At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

50.     Defendant is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

51.     By its actions detailed above, Defendant has unlawfully discriminated against Plaintiff on the basis of her race in violation of Title VII.  Such actions include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) awarding her no bonus for 2011 despite the fact that she was the highest producer in her group that year; (g) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even though she was the highest producer in her group that year; (h) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (i) reprimanding and humiliating her in front of her peers; and (j) terminating her employment after she complained of BNP's discriminatory conduct.

52.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain, and mental anguish in an amount to be determined at trial.

53.     Defendant's discriminatory conduct was engaged in with malice and/or reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore entitled to punitive damages under Title VII.

## SECOND CAUSE OF ACTION
### (Sex Discrimination under Title VII – Against BNP)

54.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

55.     On September 24, 2015, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on September 29, 2015.

56.     At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

57.     Defendant is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

58.     By its actions detailed above, Defendant has unlawfully discriminated against Plaintiff on the basis of her sex in violation of Title VII.  Such actions include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) awarding her no bonus for 2011 despite the fact that she was the highest producer in her group that year; (g) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even

though she was the highest producer in her group that year; (h) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (i) reprimanding and humiliating her in front of her peers; and (j) terminating her employment after she complained of BNP's discriminatory conduct.

59.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain, and mental anguish in an amount to be determined at trial.

60.    Defendant's discriminatory conduct was engaged in with malice and/or reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore entitled to punitive damages under Title VII.

## THIRD CAUSE OF ACTION
### (Retaliation under Title VII – Against BNP)

61.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

62.    On September 24, 2015, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on September 29, 2015.

63.    At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

64.    Defendant is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

65.     Plaintiff opposed Defendant's unlawful conduct by complaining to BNP that she was being subjected to discriminatory and retaliatory treatment.  Plaintiff also filed a Charge of Discrimination against BNP with the EEOC.

66.     This opposition by Plaintiff to Defendant's unlawful employment practices constitutes protected activity under Title VII, 42 U.S.C. § 2000e-3(a), and was well known to BNP.

67.     Defendant responded to Plaintiff's complaints by retaliating against her in violation of Title VII, 42 U.S.C. § 2000e-3(a).  Such retaliatory acts include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (g) reprimanding and humiliating her in front of her peers; and (h) terminating her employment after she complained of BNP's discriminatory conduct.

68.     As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain, and mental anguish in an amount to be determined at trial.

69.     Defendant's retaliatory conduct was engaged in with malice and/or reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore entitled to punitive damages under Title VII.

## FOURTH CAUSE OF ACTION
### (Race Discrimination under Section 1981 – Against BNP)

70.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

71.     Defendant's conduct toward Plaintiff constitutes an infringement of Plaintiff's right to make and enforce contracts regardless of her race in violation of Section 1981. Such conduct includes:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) awarding her no bonus for 2011 despite the fact that she was the highest producer in her group that year; (g) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even though she was the highest producer in her group that year; (h) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (i) reprimanding and humiliating her in front of her peers; and (j) terminating her employment after she complained of BNP's discriminatory conduct.

72.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain, and mental anguish in an amount to be determined at trial.

73.     Defendant's discriminatory conduct was taken with malice and/or reckless indifference to Plaintiff's rights.  Plaintiff is therefore entitled to punitive damages.

16

**FIFTH CAUSE OF ACTION**
**(Race Discrimination under the New York City Human Rights Law – Against BNP)**

74.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

75.     Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

76.     Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

77.     By its actions as set forth herein, Defendant has unlawfully discriminated against Plaintiff on the basis of her race in violation of the New York City Human Rights Law, § 8-107(1)(a).  Such actions include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) awarding her no bonus for 2011 despite the fact that she was the highest producer in her group that year; (g) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even though she was the highest producer in her group that year; (h) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (i) reprimanding and humiliating her in front of her peers; and (j) terminating her employment after she complained of BNP's discriminatory conduct.

78.    As a result of Defendant's discrimination, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain and suffering, and mental anguish in an amount to be determined at trial.

79.    Defendant's discriminatory conduct was taken with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages under the New York City Human Rights Law.

## SIXTH CAUSE OF ACTION
### (Gender Discrimination under the New York City Human Rights Law – Against BNP)

80.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

81.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

82.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

83.    By its actions as set forth herein, Defendant has unlawfully discriminated against Plaintiff on the basis of her gender in violation of the New York City Human Rights Law, § 8-107(1)(a).  Such actions include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) awarding her no bonus for 2011 despite the fact that she

was the highest producer in her group that year; (g) awarding her a much lower bonus in 2010 than what was promised to her upon her hiring even though she was the highest producer in her group that year; (h) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (i) reprimanding and humiliating her in front of her peers; and (j) terminating her employment after she complained of BNP's discriminatory conduct.

84.    As a result of Defendant's discrimination, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain and suffering, and mental anguish in an amount to be determined at trial.

85.    Defendant's discriminatory conduct was taken with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages under the New York City Human Rights Law.

**SEVENTH CAUSE OF ACTION**
**(Retaliation under the New York City Human Rights Law – Against BNP)**

86.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

87.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

88.    Defendant is an "employer" under § 8-102(5) of the New York City Human Rights Law.

89.    Plaintiff opposed Defendant's discriminatory treatment by engaging in the protected activity described herein.

19

90.     Defendant responded to Plaintiff's complaints by retaliating against her in violation of the New York City Human Rights Law, § 8-107.  Such retaliatory acts include:  (a) taking away some of Plaintiff's accounts and redistributing most of those accounts to less qualified white and/or male employees; (b) promising coverage of her accounts to white and/or male potential new hires; (c) preventing her from attending client meetings; (d) purposefully withholding information from her regarding client developments; (e) giving her low performance reviews; (f) constantly critiquing her performance and interactions with clients, while not applying the same level of scrutiny to her peers; (g) reprimanding and humiliating her in front of her peers; and (h) terminating her employment after she complained of BNP's discriminatory conduct.

91.     As a result of Defendant's retaliation, Plaintiff has suffered substantial damages including lost wages and benefits, emotional pain and suffering, and mental anguish in an amount to be determined at trial.

92.     Defendant's retaliatory conduct was taken with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages under the New York City Human Rights Law.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.     an award of Plaintiff's actual damages (including underpayment) in an amount to be determined at trial for back pay, front pay, and lost benefits;

B.     compensatory and punitive damages, in an amount to be determined at trial;

C.     an order providing that Defendant must cease and desist from its discriminatory practices;

D.     pre-judgment and post-judgment interest;

E.     costs and attorneys' fees incurred as a result of this action; and

F.     all such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: New York, New York
       December 22, 2015

                              LIDDLE & ROBINSON, L.L.P.

                              By: _____
                                   Blaine H. Bortnick
                                   Jeffrey L. Liddle
                                   LaKeisha M.A. Caton

                              800 Third Avenue
                              New York, New York 10022
                              (212) 687-8500

                              *Attorneys for Plaintiff*